UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RACHEL TATE, a Minor, by her Next
Friend, Richard Tate,

    Plaintiff,

-vs-

ARBOR HEIGHTS COMMUNITY JUSTICE
CENTER, d/b/a Arbor Heights Center,
EDWARD LARSON, in his individual capacity,
and PAMELA LENOIR, in her individual
capacity, jointly and severally,

    Defendants.

Case No. 06-14877

Judge Avern Cohn

_____/

# MEMORANDUM AND ORDER DENYING
# LARSON AND LENOIR'S MOTION FOR SUMMARY JUDGMENT

## I. Introduction

This is a civil rights case brought under 42 U.S.C. § 1983. Plaintiff Richard Tate brings suit on behalf of his daughter Rachel Tate ("Tate"). At the time of the incident giving rise to her claim, Tate was a 15-year-old ward of the State of Michigan living in the state-run Arbor Heights Community Justice Center ("Arbor Heights") in Ann Arbor, Washtenaw County, Michigan. On January 16, 2005, Tate went on an outing to a local movie theater. She was under the supervision of two Arbor Heights staff members, defendants Edward Larson ("Larson") and Pamela Lenoir ("Lenoir"). Larson and Lenoir allowed Tate to leave the theater to go the restroom, at which point she fled, going off

with some young adult males.  At some point while she was away from the center, Tate says she was raped.

Tate brought suit against Arbor Heights, Larson, and Lenoir, claiming that they violated the Eighth and Fourteenth Amendment by allowing her out of their sight and failing to prevent her from running away.  Now before the Court is Larson and Lenoir's motion for summary judgment.[1]  For the reasons stated below, Larson and Lenoir's motion will be denied.

## II. Facts

Tate was born August 23, 1989.  Growing up, she had a pattern of running away from home.  On October 21, 2004, she was declared a state ward by order of the Macomb County Circuit Court, Juvenile Division.  On November 10, 2004, the court involuntarily committed her to Arbor Heights.  She arrived at Arbor Heights on November 18.

Arbor Heights was a low-security juvenile facility operated by the Bureau of Juvenile Justice, a division of the Michigan Department of Human Services.  Arbor Heights was licensed to provide care for individuals ages 12 to 19.

At the time Tate arrived, Arbor Heights employed a "level" system for assessing behavior of the residents and assigning privileges and responsibilities.  There were five levels: new member, kid, provisional, student I, and student II.  New arrivals at the facility were classified as new members, the most restrictive level.  As the residents of Arbor Heights earned the trust of the staff, they could ascend to higher levels and be

---

[1] Arbor Heights has not joined the motion.

2

granted privileges such as a later bedtime, permission to leave the facility to attend school or work, and permission to go on recreational outings without staff supervision. At the time of the incident in question, Tate was on kid level, which required her to be under direct staff supervision (meaning that she was to be in the direct line of sight and hearing of a staff person) at all times if she left the Arbor Heights facility.

As Larson and Lenoir knew, Tate had a history of attempting to run away during group outings. Larson and Lenoir also knew that Tate had a history of inappropriate, sometimes risky sexual behavior; her initial treatment plan at Arbor Heights set a goal for "Rachel to eliminate all promiscuous or inappropriate sexual behaviors." The initial treatment plan also noted that Tate was highly impulsive and that she might have sustained a traumatic brain injury during an automobile crash in 2000.

One incident illustrative of Tate's behavioral problems occurred on December 4, 2004, slightly more than a month before the events at issue in this case. That day, Tate ran away from a group outing, supervised by Larson, and went to a gas station across the street, where she apparently made sexual advances toward an attendant. She was captured with the assistance of local law enforcement and returned to Arbor Heights.

Tate again attempted to run away on December 14, 2004, by running from the Arbor Heights building. She was stopped in the parking lot and returned to the facility.

During a visit to her parents' home in early January 2005, Tate once again attempted to run away. Tate's father caught her and immediately returned her to Arbor Heights, where he informed the staff about the incident.

On the evening of January 16, 2005, Tate attended an outing at a local movie theater located in a shopping mall. Larson and Lenoir supervised the outing. Tate was

supposed to be sitting with other residents from Arbor Heights, but in the darkened auditorium, unbeknownst to Larson and Lenoir, she moved to sit next to some young adult males and began talking with them. Tate planned to leave the auditorium and meet up with the males in the parking lot. Tate then went to Larson and said that she was menstruating and needed to use the restroom. Tate "pinkie promised" Larson that she would return. Larson then allowed her to leave the auditorium along with another resident of Arbor Heights; the other resident also had some history of truancy. Upon leaving the auditorium, Tate immediately left the theater and met the young males in the parking lot. Within minutes, she got into a car and was driven away.

The other resident reported to Larson and Lenoir that Tate had run away. They immediately began searching the theater, the surrounding concourse in the shopping mall, and the parking lot, but to no avail. Larson and Lenoir notified the director of Arbor Heights, the University of Michigan Department of Public Safety (Arbor Heights was situated in the midst of the university's main campus), and Tate's parents.

Tate says that she traveled approximately 45 minutes in the car with the young males before arriving at a private home. According to Tate, the males got drunk after arriving at the house, and one of them raped her during the night.

The following morning, one of the males dropped Tate off outside a grocery store in Ann Arbor. Tate phoned Arbor Heights around 11:45 am and asked to be picked up. A staff member drove to the grocery store to retrieve Tate; Tate estimates it took about 20 minutes for the staff member to arrive after she placed the call.

Tate did not interact with Larson and Lenoir upon returning to Arbor Heights. Tate's parents were called and they drove to the facility. Sometime that evening,

Rachel informed the staff that she had been raped.  There was some period of time afterwards (it is unclear precisely how long) where Rachel stayed at the facility; the director of Arbor Heights informed Tate's parents that they had been unable to take Rachel to seek medical attention because of a staff shortage.  A staff member subsequently transported Rachel to the nearby University of Michigan Hospital where she underwent a full physical examination, including a rape kit.  The results of the rape kit test were positive for semen.  The test also yielded a DNA profile, which did not match any records in the Michigan Combined DNA Index System.  The Arbor Heights staff member also contacted the University of Michigan Department of Public Safety.  Public Safety officers came to the hospital to take Tate's statement.

### III.  Standard of Review

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving

5

party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. Analysis

### A. Fourteenth Amendment

Tate claims that Larson and Lenoir violated her Eighth and Fourteenth Amendment rights by failing to do more to prevent her from running away at the movie theater. Because Tate was involuntarily committed to Arbor Heights rather than being convicted in criminal proceedings, she was not subjected to "punishment" within the meaning of the Eighth Amendment; the Fourteenth Amendment supplies the proper

6

constitutional standard for evaluating her claim.  See Youngberg v. Romeo, 457 U.S. 307, 314-16 (1982) (recognizing involuntarily committed patient's right to "conditions of reasonable care and safety" under the Fourteenth Amendment); Terrance v. Northville Regional Psychiatric Hosp., 286 F.3d 834, 848 (6th Cir. 2002) ("The involuntarily committed have greater rights regarding confinement under the Fourteenth Amendment than criminals are due under the Eighth Amendment."); Gann v. Schramm, 606 F. Supp. 1442, 1447-49 (D. Del. 1985) (recognizing Fourteenth Amendment substantive due process claim under § 1983 for suicide death of involuntarily committed mental patient).

Ordinarily, state actors are under no constitutional obligation to protect citizens from private violence.  DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 197 (1989).  However, the Supreme Court in DeShaney also recognized that when a state takes a person into custody, "the Constitution imposes on it a corresponding duty to assume some responsibility for his safety and general well-being."  Id. at 200.  With respected to involuntarily committed residents of a state institution, the Fourteenth Amendment imposes on the state "an unquestioned duty to provide reasonable safety for all residents and personnel within the institution."  Youngberg, 457 U.S. at 324.  A professional's decision concerning the safety of an involuntarily committed person is "presumptively valid," and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Id. at 323.  The question at the summary judgment stage thus becomes whether there is a genuine issue of material fact as to "whether the actions and inactions of the named defendants were based upon accepted

professional judgment." Terrance, 286 F.3d at 848. "Throughout this analysis, courts must acknowledge that a heightened degree of protection must be afforded to the involuntarily committed." Id. at 849.

**B. Discussion**

Tate says that Larson and Lenoir substantially departed from accepted professional judgment by failing to keep her under their direct supervision and allowing her to truant during the visit to the movie theater. As an initial matter, it is uncontested that Larson and Lenoir violated the Arbor Heights policies for a "kid" level resident by allowing her out of their direct line of sight to use the restroom. Standing alone, however, the violation of Arbor Heights's own policies is of no constitutional significance, as the policies and procedures that a state institution chooses to adopt as a matter of discretion do not create constitutional rights. Hewitt v. Helms, 459 U.S. 460, 471 (1983).

The Court is unaware of any published decision with a fact pattern very similar to the one in this case. The most closely analogous cases involve claims against state-run institutions and/or their staffs for failing to prevent residents from committing suicide. There is no indication that Tate was suicidal, but her impulsivity and unrestrained sexuality resulted in a serious danger to herself that may be likened to a suicidal impulse. Courts have found that summary judgment is inappropriate where hospital staff disregard a serious risk of suicide. See, e.g., Sidwell v. County of Jersey, No. 05-CV-530, 2006 WL 1375224 (S.D. Ill. May 15, 2006).

In Sidwell, the decedent was arrested for trying to pass a forged prescription. He twice unsuccessfully attempted suicide while in police custody. Later the same day, he

complained of chest pains and was transported to a hospital, where an individual defendant loosened his restraints and left him unsupervised. The decedent escaped and hanged himself from a tree on the hospital grounds. Since the decedent was a pretrial detainee, the Sidwell court applied a less stringent "deliberate indifference" standard to his § 1983 Fourteenth Amendment claim. Id. at *6. Nonetheless, the court refused to grant summary judgment in favor of the defendants, holding that "[b]y leaving a highly suicidal inmate alone and unrestrained in an open hospital facility...Defendant[s] may have disregarded a serious risk to the Decedent's health and safety." This case involves a similar failure to provide adequate supervision of a person in custody known to present a serious risk to her own health and safety. Moreover, as an involuntarily committed patient Tate is entitled to a "heightened degree of protection" under the Fourteenth Amendment; the legal standard in this case is thus somewhat more generous to the plaintiff than was the standard in Sidwell.

There are a number of other cases that recognize potential violations of the Eighth or Fourteenth Amendments for failure to supervise suicidal patients or inmates adequately. In a Seventh Circuit case, Sanville v. McCaughtry, 266 F.3d 724 (7th Cir. 2001), the complaint alleged that a prison inmate who had manifested suicidal tendencies in several ways covered all of the windows to his cell with toilet paper. Several prison guards saw that the windows were covered, but took no action for approximately five hours, despite their knowledge of the inmate's suicidal tendencies. During the time he was unsupervised, the inmate fashioned a noose from his bedsheets and asphyxiated himself. Reversing the district court, the Seventh Circuit held that the complaint should not be dismissed for failure to state a claim, since "failing to determine

9

what was going on in [the inmate's] cell could easily be considered egregious enough to rise to the level of deliberate indifference." Id. at 739.  As in Sidwell, the Sanville court allowed the plaintiff's case to proceed despite a more stringent "deliberate indifference" standard under the Eighth Amendment.  To avoid summary judgment, as noted above, Tate need not prove that the defendants were "deliberately indifferent," but only that they "substantially departed from accepted professional judgment."

Read in the light most favorable to Tate, the record in this case indicates that Larson and Lenoir may have substantially departed from accepted professional judgment in allowing Tate to leave the theater without any staff supervision.  Larson and Lenoir were aware that Tate displayed an extreme compulsion toward risky sexual behavior, a diminished capacity for self-control more generally, and a known propensity for truancy.  Tate's status as an involuntarily committed state ward was predicated on the judgment that she required supervision in order to avoid endangering her own health and safety.  Accordingly, Larson and Lenoir should have foreseen that allowing Tate out of their direct supervision entailed a substantial risk that she would place herself in a situation that endangered her safety.  In particular, the risk of inappropriate sexual activity was foreseeable in light of Tate's past behavior.  Despite these serious, foreseeable risks (and, as noted above, in violation of Arbor Heights policy), Larson and Lenoir allowed Tate to leave the theater and go into the shopping mall without staff supervision.  This set in motion a series of events that a jury could find resulted in harm to Tate – indeed, the very sort of harm that was foreseeable based on the facts noted above.

Given the factual record here, <u>Sidwell</u>, <u>Sanville</u>, and their ilk counsel against granting summary judgment in favor of Larson and Lenoir.  A jury could reasonably find that Larson and Lenoir did not exercise accepted professional judgment in allowing Tate to leave the theater without staff supervision.  Furthermore, in light of <u>Youngberg</u> and its progeny, an involuntarily committed patient's right to supervision so as to avoid undue risk to her own health and safety was sufficiently well-established that Larson and Lenoir are not entitled to qualified immunity.

## V. Conclusion

For the reasons stated above, Larson and Lenoir's motion for summary judgment is DENIED.

SO ORDERED.

      s/Avern Cohn
      AVERN COHN
      UNITED STATES DISTRICT JUDGE

Dated:  August 8, 2008


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 8, 2008, by electronic and/or ordinary mail.


      s/Julie Owens
      Case Manager, (313) 234-5160